The next matter is Martik Brothers v. Huntington National Bank. Mr. Gracie, good morning. Chief Judge Sarekha, and may it please the Court, Robert Gracie and Eckert Siemens on behalf of the appellant Martik Brothers, with the Court's permission, I'd like to reserve two minutes for rebuttal, Your Honor. Fine. The Court is aware, I'm sure, that we're here on appeal from the District Court's grant of summary judgment on behalf of Huntington National Bank. Martik, of course, seeks reversal of that judgment and a remand for trial. It's our view that the District Court, in granting summary judgment, exceeded its authority under Rule 56 and made factual determinations, not looking at the facts and the reasonable inferences arising from the facts. It seems this morning we've got a lot of matters dealing with state of mind, which are normally jury issues, which is one of the arguments here, and particularly with respect to statements that were made by the lender, and perhaps you could zero in on those for us. Your Honor, you've identified what we believe is the most critical issue and the reason why the District Court erred in granting summary judgment in this matter. I won't belabor the facts, other than to say, as the Court is aware, that there were two contracts that my client entered into with the developer of this project, Keebler Slippery Rock, LLC. Those two contracts had to do with the construction of 14 of 19 buildings. You'll see reference in the pleadings and in the documents to two phases, Phase I and Phase II. Phase I was 14 buildings and a clubhouse and the site work. My client entered into two contracts with Keebler for 14 buildings. Of the 19, the other five were Phase II. The site work applied, and that was a second contract, applied to all of the buildings that would ultimately be built. But all that was being built and all that was being funded was Phase I. Mr. Gracie? Yes, Your Honor. Let me direct you to the issue of reasonable reliance and ask you to help me understand why in a certain – I mean, this was a multimillion-dollar construction project, right? Yes, Your Honor. And these are heavily documented transactions, right? Lots of paper. Isn't that true? Yes. And, in fact, every time you want to get paid, if you're a general – I mean, you've got to submit these AIA forms to get the money. I mean, things don't happen without a paper trail at each step along the way, correct? Absolutely, Your Honor. Okay. So – But also, I observe, Your Honor, the AIAs in this case were provided from my client Martek to the bank, not through the borrower, but directly to the bank. I understand the factual setting. In that context, how could it be said by a rational jury that it was reasonable for Martek to take the comment, you don't have anything to worry about as people are walking out of they would be fully paid despite any financial problems that the project might be experiencing? A very good question, Your Honor, and I think the answer is this. If you take those comments completely out of context, just that they were said, I think there's reference in the – there is reference in Frank Martek's deposition where he said this was chit-chat, kind of like small talk. And he also said that this was an amicable meeting. Nobody was angry with one another. They were happy with my client's work. But what was the meeting called for? What was the purpose of the meeting? The purpose of the meeting was to determine whether or not the project was on budget, to make sure that there were sufficient funds in the loan to complete the project as it was understood by the bank. As you said, I mean, the – Yeah, and they had the formal meeting. This comment doesn't occur at the formal meeting. It's by everybody's account, including your client's. It's after the meeting. It's sort of, as Frank Martek said, it was the chit-chat on the way out the door. So it looks like they had their meeting. They had their formal discussion. And then there's this, quote, off-the-cuff, unquote, comment. What consistent with reasonable commercial behavior would say, oh, yeah, it was reasonable to rely on that as a promise that you're going to get paid no matter what? Well, again, Your Honor, if I might, if you put that comment along with the comment the next day in the context that the whole purpose of the meeting was to discuss the financing, to discuss the loan balance, to discuss whether or not there were sufficient funds, that it And you have to also, I believe, Your Honor, look at Frank Martek's testimony at his deposition, which was before the district court, that – and it's before this court in the appendix. And, of course, this court applies the same standards that the district court was supposed to. The Martek brothers' representatives, Frank and Dean Martek, were excluded from the discussions about the AIAs at the meeting. Now I recognize that Mr. Dexter, the bank's representative, says that we discussed this with them. We discussed the shortfalls. That's a huge factual contradiction. And I would submit to the court a very large, genuine issue of material fact. So they were not parties to most of the discussion that happened at the meeting that was called for the purpose of determining whether or not they were on – they were on budget. But the – it wasn't just the one conversation, and with all due respect, Judge Schwab in the court below really doesn't talk about the call for the next day. And what was that – what was that telephone call about? Well, the telephone call was because – I'm sorry, Judge Greenberg, I didn't mean to cut you off. The telephone call was a follow-up, wasn't it, or was it just a comment? Yes, sir. It was the next business day, whether it was the immediate next day or there was an intervening weekend my client couldn't remember. But he called because they were so concerned about payment, because they were already having payment problems. They had been asked – as I said earlier, the site work contract was not to be divided into phases. Keebler, with the – at the request – I think it's reasonable to interpret the facts – at the request of Huntington said, get them to separate the site work contract into phases. But once they started doing that, Huntington stopped paying any AIA, any invoice that said phase two on it. So they were already having some payment problems. So the next day, because Mordech brothers were concerned about whether or not there would be enough money to pay the full contract for the completed project, which they were approaching. They were approaching their completion. He called up and he specifically asked Mr. Dexter, point blank, as is referred to in his deposition, is there going to be sufficient monies in the loan to finish the project? And without equivocation, without qualification, he didn't say, yeah, I think so, or, yeah, they're trying to get additional funding. He said yes. And all they were talking about, the dealings between Huntington and Mordech were all centered around the loan and the availability of funds to pay off the work. So you have to put all that into context. At that particular point, when Dexter made that response, what did he know or what should he have known? Well, we believe that he knew starting in January that there were shortfalls. And on the same date as the meeting, June 7th, there is what is referred to, Your Honor, as a construction monitoring report prepared by Mr. Dexter. Originally, he said he didn't remember any such report, but then when he showed it at the deposition, he said, oh, yeah, I did that. And he said in that report, no, there are not sufficient funds to complete this project. There is a shortfall of, I believe it was $1.077 million at that point. Isn't the comment, the question, as Mr. Mardek said it in the phone call, is there, quote, sufficient funds in the loan and the monies that Keebler had left with his loan agreement with Huntington Bank to pay us for our contract, unquote? You have the record in front of you, Your Honor. Well, that seems to me different than saying, is there enough money in this to complete the project? Those are different questions, aren't they? To say there's enough to finish the project is not the same as saying there's enough to pay you out on your contract, or am I wrong? No, I think that's a distinction. I think if there was that fuzziness, and I didn't mean to misquote it, I was paraphrasing, Your Honor, and what the quote is, is what this Court has to rely on. But they asked, is there enough money to pay us out on our contracts, which were the two contracts that were used to establish the budget for this whole project? Well, if it said for our contract, I guess the question I'm putting to you is, there's at least enough ambiguity in that comment to cause you, skilled counsel, to have some challenge with it here at the podium, me to need to go back and look at it. I mean, how are we to say that on a phone call, which appears to be a follow-up to a very casual conversation, that Mr. Marduk, asking this question as he describes it in his deposition, has got Mr. Dextra on notice, hey, I'm asking you about the overall project, money's in the project, and I'm about to rely on this in deciding whether to stay on this job. Let me, before you answer that, I think I have the quote here, asked in point blank, were there sufficient funds in Keebler's loan to pay us for the remaining work up here? And he said, yes, there was. And that was, that's what I was trying to paraphrase, Your Honor. If there is any ambiguity there, Your Honor, again, I think it gets back to our initial premise, and that is that these factual disputes have to be resolved at this stage in the proceedings in favor of the non-moving party, in this case, the plaintiff, Marduk. So you let the jury make a determination, and particularly, as the Chief Judge said at the outset, recognizing what these cases are about and dealing with the issue of intent and credibility. What, excuse me, what about the distinction between opinions and facts? The, Huntington argues that these responses were opinions and beliefs based on speculation and conjecture. Is that an accurate way? I don't believe it is, Your Honor. In the only case that we've been able to cite, and it is in our brief, actually it's in all the briefs, the G case, G-E-E, where there was a detrimental reliance claim, and in that case, the one party that was allowed to recover on detrimental reliance had asked the lender, similar situation that we found ourselves in, about the financial situation with that particular borrower, and the lender said, oh, the borrower's strong, everything seems okay. And there the court said that that supported a determination for detrimental reliance. Here, it was, there was no equivocation. These weren't, we believe, and the district court didn't find, at least in respect to misrepresentation, the only time the district court references opinions is in the promissory or estoppel or detrimental reliance context. What is the evidence from which you can establish a reasonable inference that Marduk would have walked away if he had known? The district court makes a big point about that, that that was never communicated, but I would submit to your honor that, number one, it's not important because the district, our client wasn't in a position to have to say that because he was assured that there was money. It's kind of an if-then situation. If he told me that there was enough money, then I would have walked. He told me there was enough money, I believed him, and he believed the person, the entity, and the representative of the entity that had been paying all of his bills throughout the process. I just had one question. I have no problem at all understanding your misrepresentation case in which you're not asking us for a judgment, you're just asking us for a trial, and I understand that very well, but I can't understand what the unjust enrichment claim adds to it. It seemed to me, in other words, it seemed to me that it really didn't add anything to it. It's not like, well, if I can prove this set of facts, I went on this theory, and this set of facts, I went on another theory. It just seemed to me to be sort of overlapping. I just couldn't see that it added anything. I believe your honor is correct. They were pled alternatively. Of course, unjust enrichment is a quantum error with quasi-contract recovery, but that all depends, though, on the misrepresentation. If there was no misrepresentation at all, and your client was just performing, and then said, oh, the bank owes me on unjust enrichment, I don't think you'd be standing here bringing this case. I think you're relying, really, on the misrepresentation. In other words, you could say, look, I did all this work, and the bank's got the security, and they've been unjustly enriched at my expense. And the bank could say, well, nobody told you, you fool, that you should go ahead without the money. And I think that would be a legitimate answer, but that's not your theory. Your theory, it's all tied up with the misrepresentation. It is all tied up with the misrepresentation, and the Meehan case, which we cite in our brief, Your Honor, talks in terms of the situation where the third party, who we assert is unjustly enriched, in this case, the bank, misled our client into continuing to perform. So it is all tied together. Your theory is, even if you didn't have the theory of unjust enrichment, you're still entitled to recover. Yes, Your Honor, under any of the theories. I just couldn't see where that is. Good. Thank you, Mr. Gracie. Thank you. Thank you, Your Honor. Mr. Zepp. Good morning. Good morning, Your Honor. Charles Zepp, representing Huntington National Bank, FLE. The first point I wanted to make is something that seemed to be missing the point on quite a bit, and he misstated it earlier. It was always the party's understanding that Keebler, the developer of this property, had the obligation to pay Mardik Brothers. Mardik had a contract, contractual arrangement with Keebler. Keebler had a contractual arrangement with the bank. The bank owed duties to Keebler. Keebler owed duties to Mardik. If it weren't for the two representations, I don't think that we would be here today, in fact. But we do have those two representations. So, why don't you speak to the point about whether or not somebody's entitled to rely on a comment when it's put point blank to them. Is there, and we've got, the Chief and I are looking evidently at two different places where Mr. Mardik describes this, but on 287 of the record, the language I have is, I asked Mr. Dexter if there was sufficient funds in the loan and the monies that Keebler had left with his loan agreement with Huntington Bank to pay us for our contract, that's line 17-20. And the answer he's given is yes. If you ask somebody point blank a question like that, why aren't you entitled to believe them? Well, I think at this point, when Frank Mardik asked this question, Frank Mardik certainly was already aware that there were payment problems on the project. They had issues with it. Further... Of course he was. That's why he asked the question. Yeah, I understand. I guess the point that I want to make is that at this point in time, based on the information that Mr. Dexter had, he was asked, and if you look at how the question was asked, he was asked to express his opinion on it, and he did. Is that an opinion question, or is it just a straight up question about, look, you're paying out the money on this project, and you know what's going on with the project. Is it going to be short or not? And as a matter of fact, the record does reveal, Dexter has the facts on that, right? He's got internal information indicating it's in trouble at this point in time, doesn't he? Dexter has information that there are issues with respect to a shortfall. He also has information that any shortfalls are going to be made up by Keillor's attempts to get alternate funding, and he was assured of that fact at the June meeting that we've been talking about. Well, that's not exactly a straight answer then that he gave, that, well, they're going to make it up. He asked whether there's additional money there. Yeah. And what you're saying is, well, they were going to get it. Well, he might have told them that, I mean... Well, I think... And I think we're talking about the phone call conversation, is that right? Right. Right. This is the phone call. I think that the question he asked him was if there were sufficient funds, and Dexter, based on the information that he had at the time, offered his opinion that there would be sufficient funds. Is that... I'm sorry. I'm sorry. I just wanted to say, you know, if you said to a corporation's directors, are you going to make enough money next year to cover the dividend? And they said, yes, we are going to do it. Well, that's obviously not going to happen. It's not going to happen.  It's a projection. It's a projection. It's a projection as to the future. But this man was on a project, and he was substantially performing, and he asked, is the money there to pay me? And I guess you could say, yeah, it is there, except they're going to use it for something else. I mean, but that... I mean, I would take it to mean if I work, I get paid. I mean, that's... The question actually isn't, is there going to be money to pay? It's from some place. It's, is there sufficient funds in the loan? That's the question which, according to Mr. Mardik, he puts to Mr. Dexter. Is there money in the loan? Which I think any fair reading would have to mean the loan you made. Is there money in that loan? And he gets a yes. So that's the... That's the question. If it was the off-the-cuff conversation, walking out of the meeting all by itself, different case. But here we have an assertion by Mr. Frank Mardik, I called, I asked point-blank, is there money in this loan to cover this project, or as he puts it, for us to get paid on our contract? And I'm given the assurance there is, when evidence indicates there isn't. Now, how is that not a misrepresentation, and why would it be, why would it be appropriate to say it's not justifiable to rely on that in a circumstance like this? Well, one, I think, and I apologize, Your Honor, I think that when you get drilled down to it with Mr. Mardik, and I was the one who took his deposition, I think he asked if there were sufficient funds for them to pay us to completion of the project. But in any event, I think that Dick Dexter, by asking that question, I think he was inviting an opinion from Dick Dexter as to whether or not there would be sufficient funds for them to get paid at the end of everything. Mr. Dexter offered his opinion on that. He wasn't just asking a question about math? No, I don't... We're this far done in the project, how far, how much money have we burned through already? He could have asked that question, he didn't. And that goes to, I think that also goes to the reliance issues. Excuse me a second. Sure. Stay for a minute on what Dexter knew at the time about the financial conditions. Dexter understood that the bank, and all the parties understood, that the bank was only funding one phase of this project. Dexter had an, he was a construction merits manager at the bank, he had an understanding of the money that was flowing. There were estimates of shortfalls, the shortfalls were addressed. There was a meeting in June 2007 to address the shortfalls further. There's a dispute over what information was provided to Mardik at that meeting. But in any event, there's no dispute that Mardik and Keebler had discussions at that meeting. Both testified to that fact, that any funding shortfalls would be made up for by Keebler. Well, what is the, what should have happened here? Are you, is your position that one businessman can't call another and get an assurance without requiring that there be some writing, without requiring that there be a formal meeting? Well, I think if you. Otherwise, there's no justifiable reliance. I think if you call somebody, well, first of all, if you have an off-the-cuff, informal, casual conversation the first night. Set that one aside. Just focus on the phone call. I think if you call somebody the next day and you ask them the question that he had, which I suggest is asking him to give his opinion, and he gives you that opinion, I mean, that's all you have at that point is his opinion. So if they wanted to get some kind of a guarantee or an assurance, I mean, there's no doubt that Huntington didn't make a promise to pay them at that point. All Dick Dexter testified and all he said was yes, is that there might, he thought that there would be sufficient funds to pay them. Did he say, I think there's going to be sufficient funds? Well, they asked if there were going to be sufficient funds, and he answered yes. Well, sufficient funds in the loan at the time that Dexter knew there was a shortfall, right? At the time Dexter knew there was a shortfall. I don't understand how he could answer yes. Are there sufficient funds? Yes, but I know there's a shortfall, but I'm not going to tell you that. I mean, I just don't understand how he could answer yes. It's not, it doesn't seem right. If he said to them, you know, there's a shortfall, but we think we can make it up, or they'll make it up or something, it would be a more candid answer. Well, Mr. Dexter had every reason to believe at the time that the shortfall would be made up, and it's further worth noting, I think, that the bank and Mardik didn't have a relationship. The bank didn't owe any duties to Mardik. They owed a duty not to mislead him, but didn't the bank have to know when he asked that question that he was worried and he was on the project, and he wasn't asking the question idly, that he had a reason to want to know if he was going to get paid. I mean, they're not children. Don't you think they should have realized, boy, we might have a problem here? Who should have realized we might have a problem? Shouldn't the bank? Because if the Mardik pulled off, then they would have a problem. They didn't want that, I guess. Indeed, the later email exchange indicates that it was, and it's intuitive, it was very much in the interest of the bank to keep Mardik on the job, right? Then they would have a paying, presumably a paying housing project if it was completed, and if they didn't, they'd have a real expensive incomplete project. Well, I mean, at that point, quite a few things could have happened. Yeah. Well, instead of going to that counterfactual, let me ask, if I may, one additional question. You said there's evidence in the record to show that Dexter believed the shortfall would be made up, and you earlier had alluded to they thought there might be refinancing. What can you point us to exactly in the record that shows that when Dexter made this statement, yes, in response to the question, is there money in the loan, that it could fairly be said he was thinking this is going to be made up and there is other money out there. What do you point to when you say the record's got that? There's testimony from Dick Dexter at his deposition, and then there's testimony from Paul Keebler at his deposition, and I think that those are both referenced in our brief, wherein both of them, it refers to the conversations that they had about financing and the agreement that they reached. So no documents, just they're sort of after the fact. At the deposition statements, which I'm not saying is not evidence, but their statement said, oh, yeah, I thought they'd get it. They'd get refinancing. Even though we wouldn't give them more money, we thought some other financial institution would step in. I believe there's a memo to that effect that was an exhibit to one of the depositions as well. Has this project ever been finished? Yes, the project has, in fact, been finished is my understanding. Keebler Slippery Rock is in bankruptcy right now. One of the other arguments you talked a little bit about unjust enrichment, and I think the point that I wanted to make with respect to unjust enrichment is that construction loan agreement with Keebler. Huntington was obligated under that loan to fund phase one of the project. Huntington dispersed all the amounts, and that's undisputed, that it was ever supposed to disperse under phase one. So Huntington's done everything that it was obligated to do, and at the best, Huntington, and like I said, Keebler Slippery Rock's in bankruptcy, so it would be at the best. Huntington's going to get exactly what it received under the loan agreement. There's not any unjust enrichment in that case. Well, the theory of the unjust enrichment is that the project wouldn't have been finished to the extent that Martek finished it at that point, and the unjust enrichment isn't you're going to get extra money. The unjust enrichment is the value of the services of Martek from that point on. That's what I thought. I think with respect to that, the cases that plaintiff relies on for its unjust enrichment claims are all cases where the money hasn't all been dispersed or for whatever reason there's been money held back. In this case, you would be requiring Huntington to pay above and beyond what it has already paid and what it was obligated to pay. In a sense, making Huntington an insurer for Martek's decisions. I don't know how important the whole point is, though, because counsel practically admitted that it really did not add anything to this case, the unjust enrichment claim due to the misrepresentation. I think that the same is true with respect to the promissory estoppel detrimental reliance case. I think the fundamental problem with that claim is that in the conversations, both of the conversations that we've been talking about, Mr. Dexter on behalf of Huntington never made any promise to do anything, let alone pay Martek when it was always, and it was always the party's understanding, that it was Keebler's obligation to pay Martek. Unless the court has any further questions, we respectfully request the court affirm the district court's grant assignment. Good, good. Mr. Zepp, thank you very much. Thank you. Mr. Grayson. Thank you, Your Honor, and I'll be brief. Counsel repeatedly said this was an expression of an opinion, but in my read of Apelli's brief, nowhere did they state any case that's similar to this where what was said, and I agree, I think it was Your Honor who said it was a mathematical question. Well, I'm asking questions. I understand that, but I think it's a good point, Your Honor, that he was asking a very direct question and got a very direct answer. Is there sufficient money in the loan to pay us for our work? And if I've misparaphrased, I don't mean that, but the answer was yes. Not I think so, not, well, they're trying to get other financing. And, again, somebody made the point, and, again, I think it's interesting, and I believe it was Your Honor, Judge Greenberg, he wasn't entitled to lie. The district court made a big to-do about it might have been a breach of the fiduciary responsibility of the bank in discussing matters with respect to the loan. So they couldn't rely on this statement. It may have been that breach, but that would be on Huntington, not on my client. They were talking to the bank back and forth, Mordech brothers were talking to the bank back and forth routinely about this project. And if there was some obligation not to disclose account balances, it certainly didn't give Dexter a right to lie. I used to work for a fellow who said if you're asked a question that they're not going to lie, I don't work for him anymore. I never thought that that was quite the law. But, certainly, here, if Dexter wasn't authorized to give that information, he should have simply said, you have to go talk to Keebler. But he didn't. He answered the question very directly, very straightforward. Does commercial reasonableness play any part in this, Mr. Gracie? I mean, again, this is a project in which, by your client's own account, there's millions of dollars at stake. Is it commercially reasonable to base the decision whether to go forward and invest seven figures worth of time, money, effort, on a conversation which is at least ambiguous? Your Honor, I think it's commercially reasonable to ask the question, and it's not unreasonable to accept the answer from the person that you've been dealing with and who has the information. And that relates, too, to the question as to whether or not there's an opinion. If there's an opinion but only one party has the ability to gather the information or has a better ability, it's not quite an opinion in that sense, although we believe that this wasn't an opinion at all. And I see that my time has expired. I would ask the Court to reverse the order of the District Court granting summary judgment and remand the matter for trial. Thank you, Your Honors. Mr. Gracie, thank you. We thank both counsel for excellent argument this morning. The case will be taken under advisement.